## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

-------------------------------------------------x

Raven Sayers,

                    Plaintiff,                  **COMPLAINT**

     v.

                                Case No.

United States of America,

                    Defendant.

-------------------------------------------------x

Plaintiff, Raven Sayers, by and through her attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Untiedt Dabdoub, PLLC, for their Complaint against Defendant as above captioned, brings claims and alleges as follows upon information and belief:

## <u>INTRODUCTION</u>

1.    Lenton Jerome Hatten (hereinafter "Officer Hatten") was a former sports specialist or correctional officer at Federal Correctional Institute, Tallahassee (hereinafter "FCI Tallahassee") who used his position and authority to stalk, sexually abuse, harass, assault, and/or rape at least 11 women who were incarcerated at FCI Tallahassee in the custody of the United States Bureau of Prisons (hereinafter "BOP") while he was employed there. Instead of protecting the women who were

under his care and control, Officer Hatten was allowed and emboldened by BOP to prey upon them.

2.    Plaintiff Raven Sayers (hereinafter "Plaintiff" or "Ms. Sayers") is one of the victims who were sexually abused by Officer Hatten while incarcerated at FCI Tallahassee, an all-female, low-security federal prison. Ms. Sayers first arrived at FCI Tallahassee in or around 2015. She was transferred from FCI Hazelton where she had also been sexually abused by an officer. Ms. Sayers worked as a recreation facilitator at FCI Tallahassee and then as a clerk starting in mid-2020, which put her in frequent contact with Officer Hatten as her supervisor. Over time, Officer Hatten groomed, manipulated, and coerced Ms. Sayers into sexual submission, using the power and resources he had at his disposal as a correctional officer as well as a sports specialist who supervised prisoners who worked in the recreation department (colloquially known as "rec") including Ms. Sayers.

3.    Officer Hatten had an apparent *modus operandi* that was known to other BOP staff where he would exploit his power as a correctional officer and isolate himself with female prisoners in areas of FCI Tallahassee that were known to have no security cameras. For instance, as a sports specialist, he was able to, and often did, isolate himself with women in the recreation shack (hereinafter "rec shack"), which is a small shed located in the far back of the recreational yard. There was no security camera inside the rec shack; there was one at the entrance that would

apparently capture in real time who arrived and left the rec shack, but not what occurred inside. Officer Hatten had a key to the rec shack, and could lock prisoners inside as he desired. Other isolated areas within FCI Tallahassee without security cameras where Officer Hatten would spend time alone with prisoners included the second floor of a recreational building (which is a separate building from the rec shack), commonly known as "upstairs rec." Even though BOP staff should have noticed Officer Hatten's recurrent behavior of locking prisoners into an enclosed space alone with him, nothing was done to stop his suspicious behavior.

4.      After Plaintiff Ms. Sayers began to work as a rec clerk in mid-2020, Officer Hatten repeatedly locked her into the rec shack. This was not only a part of Officer Hatten's *modus operandi* in sexually abusing her, but also a way to control her socially. He would tell her to stay away from another male officer and other prisoners who had a positive relationship with her. Officer Hatten found opportunities to isolate Ms. Sayers, frequently coming to get her from her cell and walk her to rec. On countless occasions, Officer Hatten grabbed or touched Ms. Sayers's waist, legs, hands, shoulder, head, and/or buttocks in a sexual manner or intentionally rubbed his penis against her body, which made her extremely uncomfortable.

5.      In or around October 2021, Officer Hatten escalated his sexual abuse to a forcible oral rape in the rec shack, where he knew there was no security camera

inside. On this day, Officer Hatten personally came to Ms. Sayers's cell at around 6:00 AM to escort her to the rec shack. It is highly unusual for a prisoner and an officer to spend time alone in the rec shack with no one else around, as would be the case at 6:00 AM. Officer Hatten ordered Ms. Sayers to go to the staff bathroom inside the rec shack, and while she was inside, he proceeded to enter the bathroom and close the door behind him, blocking Ms. Sayers's exit. Despite Ms. Sayers's physical resistance, Officer Hatten grabbed her and forced her to perform oral sex on him in the bathroom. Following this assault, Officer Hatten verbally threatened Ms. Sayers that if she were to report him, she would be put in the special housing unit (hereinafter "SHU") or transferred to a facility far away from her family.

6.      Ms. Sayers stopped working in rec after this assault, but Officer Hatten would always find a way to put her back on his crew informally, without her being on the roster. Other BOP officers should have known that this was abnormal, and yet did nothing to intervene or investigate. Officer Hatten continued to find opportunities to lock Ms. Sayers into the rec shack. He would alternate between being threatening and being nice, to groom, prey upon, and psychologically manipulate Ms. Sayers. For example, Officer Hatten was the "cardholder" for rec, with an ability to order items online, and he would let his victims including Ms. Sayers order things that were not allowed in FCI Tallahassee such as gel pens, an airbrush kit, and tattoo ink. He would also visit her prison cell and bring her special

food like popcorn or snow cones. He did not care that other people, including Ms. Sayers's cellmate, were there to see these interactions and openly flirted with Ms. Sayers. It was highly unusual that a rec officer would make frequent social visits to a certain prisoner's cell, and other BOP staff should have intervened to stop this suspicious conduct. Instead, Officer Hatten continued to have unfettered access to Ms. Sayers, in her housing unit and at work.

7.    Ms. Sayers did not think that she could escape Officer Hatten. She knew that there was widespread knowledge among BOP staff regarding Officer Hatten's sexual abuse, and yet nothing was done for years. She also suspected that her colleague at rec, Bonnie Hernandez (hereinafter "Ms. Hernandez"), was also a victim of Officer Hatten, as she noticed him locking Ms. Hernandez into the rec shack and interacting with Ms. Hernandez the same way that he was interacting with her. Officer Hatten's blatant and apparent sexual abuse, which was widely known throughout the facility and yet condoned until his resignation in August 2022, indicated to Ms. Sayers the rape culture at FCI Tallahassee and BOP staff's willful blindness to it.

8.    After the oral rape in or around October 2021, Officer Hatten continued to take every opportunity to sexually harass Ms. Sayers, make sexually explicit comments to her, grind against her body, and grope her body including on her waist, buttocks, legs, hands, shoulder, head, and hair. He would do this openly, including

sometimes in front of Ms. Hernandez, and would also abuse Ms. Hernandez in similar ways in front of Ms. Sayers. Ms. Sayers felt immense distress, as if she was a plaything that Officer Hatten could do with as he pleased.

9.     Officer Hatten's sexual abuse of Ms. Sayers did not stop there. On or around July 29, 2022 (Ms. Sayers's birthday), Officer Hatten organize a private birthday party for Ms. Sayers in the rec shack, where the two of them and Ms. Hernandez were present. Upon information and belief, Officer Hatten paid for food (including chicken and pizza), body wash, shampoo, and nail polish. During the party, Officer Hatten propositioned Ms. Sayers for sexual favors, telling her that he expected "special treatment" for his own birthday coming up in August. Once Ms. Hernandez left to use the bathroom, Officer Hatten locked the rec shack door and demanded Ms. Sayers to provide a sexual favor "again." Ms. Sayers repeatedly declined. He came closer to her, in a threatening manner, and asked whether she was "sure." Ms. Sayers believes that she only avoided being raped on this day because Ms. Hernandez came back from the bathroom and knocked on the door.

10.     Officer Hatten's suspicious conduct and preferential treatment towards certain women including Ms. Sayers and Ms. Hernandez was a widely known fact throughout FCI Tallahassee. Yet, BOP allowed him to roam the facility with numerous opportunities to isolate, stalk, harass, abuse, and assault women including

Ms. Sayers until August 2022, when Officer Hatten decided to resign amid a criminal investigation that was initiated by Ms. Hernandez.

11.     As is common with prison sexual abuse victims, Ms. Sayers suffered her sexual abuse in silence, lest she was retaliated against or deprived of the modest privileges she had as an incarcerated individual. Officer Hatten exercised complete dominion and power over her as a correctional officer, as he had the key to her cell and control over her prison job, safety, health, welfare, and contact with the outside world. Other BOP officers who knew or should have known about Officer Hatten's sexual abuse permitted, condoned, or acquiesced to his misconduct, amplifying the Plaintiff's fear of retaliation and sense of hopelessness. Plaintiff only felt comfortable seeking legal counsel and reporting sexual abuse after Officer Hatten stopped working at FCI Tallahassee.

12.     On April 4, 2023, Officer Hatten was indicted for his sexual abuse of Ms. Hernandez, which was in violation of 18 U.S.C. § 2243(b). He quickly pled guilty on May 25, 2023, admitting in a statement of facts accompanying his plea agreement that he had engaged in sexual relationship between October 2021 and August 2022 with Ms. Hernandez. He was sentenced to three months of incarceration and five years of supervised release on August 24, 2023. *See United States v. Hatten,* No. 4:23-cr-18 (RH) (MAF) (N.D. Fl.). If the case had proceeded to trial, the Government would have proven beyond a reasonable doubt that Officer

Hatten had used FCI Tallahassee as his playground, systematically grooming, manipulating, preying upon, and repeatedly raping Ms. Hernandez.

13.    Prior to Officer Hatten's guilty plea on May 25, 2023, United States had in its possession several other victims' claims of abuse against Officer Hatten including Plaintiff Ms. Sayers's torts claim form. The extent to which these claims were investigated by the Government is unclear. By counsel, Ms. Sayers submitted a victim impact statement to the Government prior to Officer Hatten's sentencing in August 2023; Ms. Sayers also underwent an interview with the Government agents in August 2023 to report her abuse, which was conducted without notice to Ms. Sayers or her counsel. Ms. Sayers did not receive any follow-up contact or any other update regarding Officer Hatten to date. He has not been criminally charged with any additional count.

14.    The Department of Justice (hereinafter "DOJ")'s refusal to prosecute BOP officers for sexual abuse is a well-known phenomenon. In another federal prison in Florida, Federal Correctional Coleman, there were at least six BOP officers who admitted in sworn statements to have sexually abused at least 10 female prisoners. DOJ's Office of the Inspector General (hereinafter "OIG") declined to investigate or prosecute any of these officers.[1]

---

[1] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022),

15.    On November 8, 2024, recognizing that the lack of investigation on and adjudication for Ms. Sayers's abuse does not rule out that she was nonetheless a victim of Officer Hatten's sexual misconduct, the Southern District of Florida granted her motion to reduce sentence to time served under U.S.S.G. § 1B1.13(b)(4). *See United States v. Sayers,* No. 2:13-cr-14047 (JEM) (S.D. Fl.). In part, the court held: "The sexual assault and the conditions of Sayers's continued incarceration in combination with the significant and undue delay in processing her administrative claim constitute extraordinary and compelling circumstances warranting her early release." *Id.*, Dkt. 550, p. 6.

16.    During relevant times, Officer Hatten's recurrent sexual abuse of incarcerated persons was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee. Throughout Officer Hatten's employment at FCI Tallahassee until his resignation in or around August 2022, BOP personnel deliberately ignored alarming warning signs and sex abuse allegations against Officer Hatten.

---

https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 3.

17.    It was apparent to Ms. Sayers and other victims incarcerated at FCI Tallahassee that BOP personnel would not intervene to prevent Officer Hatten's sexual assaults, let alone adequately discipline, supervise, or reprimand him in accordance with BOP's purported zero-tolerance policy against suspected staff sex abuse on prisoners. Upon information and belief, at least by 2020, BOP employees were aware that Officer Hatten was spending time alone with female prisoners and engaging in inappropriate sexual and/or flirtatious interactions with them. This highly abnormal behavior continued unchecked throughout Officer Hatten's tenure at FCI Tallahassee, with the acquiescence of other BOP officers who were acting within the course and scope of their employment.

18.    One of the primary reasons Officer Hatten was able to continue abusing so many women for so long, including Ms. Sayers, is because his fellow officers did not follow the operating protocols by sharing supervisory duties with him. Upon information and belief, two officers are required to be present during shifts to jointly supervise prisoners who work in rec. Therefore, Officer Hatten should never have been alone with prisoners. However, BOP staff would frequently leave Officer Hatten to supervise prisoners by himself, including behind locked doors and/or during early morning hours. For example, during COVID, the upstairs rec was closed to prisoners, and other rec officers would go upstairs to watch TV and use the computer instead of supervising prisoners outside with Officer Hatten. Officer

Hatten took advantage of his fellow officers' dereliction of duties to accost, isolate, imprison, harass, abuse, assault, and rape women right under the eyes of the BOP.

19.    Officer Hatten took female prisoners to blind spots within FCI Tallahassee that were not captured by security cameras, contrary to the existing protocols. BOP personnel who were tasked with monitoring security cameras knew that Officer Hatten often interacted with incarcerated persons in these blind spots and stayed there for lengthy periods of time for no apparent reason. There was no intervention to correct this.

20.    Officer Hatten brought contraband into FCI Tallahassee and used them as part of his *modus operandi* in sexual abuse. He knew and exploited how valuable contraband such as cosmetics and outside food are in prison, further trapping his victims financially as well as exposing them to a threat of punishment for possessing contrabands if they were to report him. BOP personnel who were tasked with inspecting prisoners' cells or personal effects knew that Ms. Sayers had certain items that must have been brought in from the outside. There was no intervention to correct or investigate this.

21.    Suspicions and allegations of Officer Hatten's sexual abuse abounded at FCI Tallahassee by the end of 2020, as many BOP employees saw, knew of, and disregarded Officer Hatten's suspicious interactions with incarcerated persons, some of which amounted to flagrant violations of FCI Tallahassee's security or operating

protocols. Nevertheless, until August 2022, Officer Hatten continued to work as a sports specialist and/or correctional officer at FCI Tallahassee with the willful ignorance and tacit approval of his colleagues and/or supervisors, leaving countless victims in his wake, including Ms. Sayers.

22.    It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as abject systemic failures at FCI Tallahassee and BOP, that Officer Hatten's sexual abuse of Ms. Sayers was able to occur and could continue unabated until August 2022.

23.    As a result of the forementioned deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel as well as systemic failures at FCI Tallahassee, Plaintiff Ms. Sayers was forced to engage in recurrent sexual encounters with Officer Hatten by threats of force or coercion. Starting with sexual comments, groping, and grinding his body against hers in or around mid-2020, Officer Hatten's abuse eventually developed into an assaultive oral rape in or around October 2021, despite Ms. Sayers's attempts to physically and verbally fight off Officer Hatten. Officer Hatten did not stop sexually harassing, groping, and rubbing against Ms. Sayers's body throughout the remainder of his time at FCI Tallahassee. On or around July 29, 2022, shortly before he resigned, Officer Hatten attempted to rape Ms. Sayers again, which was only avoided because Ms.

Hernandez returned to the rec shack. With the benefit of willful blindness or negligence of his coworkers, Officer Hatten became increasingly aggressive and threatening over time, using FCI Tallahassee as his personal brothel.

24.    As a prisoner under Officer Hatten's custodial, supervisory, and disciplinary authority, Ms. Sayers did not have a meaningful escape from his predatory conduct. She felt that she had no choice but to comply with Officer Hatten's abuse. She knew that he could take away her privileges, job, outside contact, or even put her in the SHU, thereby lengthening her prison sentence.  She also feared that her reports regarding Officer Hatten would not be believed or taken seriously by the authorities. Indeed, this fear was proven true. Even after Ms. Hernandez took it upon herself to report Officer Hatten, the Government failed to explore the severity, frequency, and magnitude of Officer Hatten's abuse fully or accurately during his criminal proceeding, resulting in a mere 3-month sentence that does not begin to capture the egregious circumstances herein. Moreover, it was widely known among prisoners that after reporting Officer Hatten, Ms. Hernandez was placed in the SHU for "investigation," which further deterred other victims including Ms. Sayers from reporting Officer Hatten while in custody.

25.    Plaintiff Ms. Sayers experienced catastrophic and unnecessary pain and suffering because of Defendant's egregious disregard for, and carelessness towards,

Plaintiff's safety and well-being despite the myriad warning signs regarding Officer Hatten's abhorrent conduct.

26.    Plaintiff brings this suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to her by various BOP personnel within the scope of their employment with the BOP, which in turn resulted in Officer Hatten's recurrent sexual abuse.

27.    Plaintiff seeks redress for Defendant's unlawful conduct, which caused her to suffer permanent and catastrophic injuries.

## JURISDICTION AND VENUE

28.    This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiff's claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.

29.    This Court has personal jurisdiction because the alleged incidents occurred within the confines of the State of Florida.

30.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b), as a substantial part of the events or omissions giving rise to Plaintiff's

claims occurred within the boundaries of this District and Division, in the County of Leon.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

31.    Plaintiff has properly complied with the requirements of 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America, which provided the Government with adequate notice regarding Officer Hatten's abusive conduct and other BOP personnel's negligence related thereto. The Claim was timely filed with the BOP on or around December 19, 2022, within two (2) years of the accrual of the causes of action.

32.    On November 1, 2024, the BOP unilaterally denied the Plaintiff's Claim. By filing this action within six months of that denial, Plaintiff has hereby properly exhausted requisite administrative remedies under 28 U.S.C. §§ 2401(b) and 2675(a). Moreover, this action is timely brought within the statutory time limits provided in 28 U.S.C. §§ 2401(b) and 2675(a).

## PARTIES

### Plaintiff

33.    At all times relevant hereto, Plaintiff Ms. Sayers was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Sayers was released from FCI Tallahassee in or around November 2024, through

the aforesaid motion for sentence reduction. She currently resides in the State of Florida.

## **Defendant**

34.    Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiff's claims under the FTCA. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

35.    At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all federal correctional matters including at FCI Tallahassee and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Officer Hatten.

36.    In addition, at all relevant times, Defendant United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

37.    At all times relevant hereto, Defendant United States, acting through the BOP, hired Officer Hatten, as well as his colleagues and supervisors, to serve as "law enforcement officer" within the meaning of 28 U.S.C. § 2680(h).

38.    At all times relevant hereto, Officer Hatten was a sports specialist, recreational officer, correctional officer, and/or an employee of BOP and Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Officer Hatten was responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

39.    At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also employees of BOP and Defendant United States. In their capacity as agents, servants, and employees of Defendant United States, and within the course and scope of their employment as such, these officers were responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

40.    At all times relevant hereto, Officer Hatten was an agent, representative, or employee of Defendant United States. At all times relevant hereto, Officer Hatten was the authorized agent, servant, or contractor of Defendant United States, acting with the permission, ratification, approval, and consent of Defendant United States.

41.    At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also agents, representatives, or employees of Defendant United States. At all times relevant hereto, these officers acted within the course and scope of said agency, representation, or employment and were within the scope of their authority, whether actual or apparent. At all times relevant hereto, these officers were the authorized agents, partners, servants, or contractors of Defendant United States, and the acts and omissions herein alleged were done by these officers acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of Defendant United States.

## JURY DEMAND

42.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues and claims in this action that are so triable.

## FACTUAL BACKGROUND

**INDICATIONS AND WARNING SIGNS OF HATTEN'S SEXUAL ABUSE**

43.    Plaintiff hereby repeats, reiterates, and incorporates by reference paragraphs 34 through 41 with the same force and effect as if fully set forth herein.

44.    Congress enacted the Prison Rape Elimination Act (hereinafter "PREA") in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of prisoners. Pursuant to PREA, DOJ

promulgated certain regulations, which remain binding on all BOP facilities, including FCI Tallahassee. *See* 28 C.F.R. § 115. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; "signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a).

45.    In addition, BOP's policies titled "program statements" set forth rules and procedures that all BOP employees were required to follow during relevant time periods:

     a.  Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

     b.  Program Statement 3420.11 states that BOP employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with prisoners, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

c. Program Statement 3420.11 goes on to state that "[a]ll allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

d. Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements a zero-tolerance policy toward all forms of staff-on-prisoner sexual abuse, including sexual harassment.

e. Program Statement 5324.12 mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

46. BOP policy requires training of all employees who may have contact with prisoners on how to fulfill their responsibilities under these rules and procedures.

47. Upon information and belief, Officer Hatten's employment at FCI Tallahassee began in or around 2018.

48. Prior to being placed in FCI Tallahassee, Officer Hatten worked at Marianna Camp, another female BOP facility that is located about an hour away from FCI Tallahassee in the State of Florida. Upon information and belief, BOP personnel at Marianna Camp were made aware of Officer Hatten giving commissary

items or paying for phone minutes for certain women prisoners, which was a warning sign of inappropriate relations. Knowing this, BOP still placed Officer Hatten in FCI Tallahassee, a female facility where he would have access to more victims.

49.     Throughout the time that Officer Hatten worked as a sports specialist and/or correctional officer at FCI Tallahassee, from around 2018 through August 2022, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel. He utilized similar methods to stalk, assault, abuse, and terrorize at least 11 different victims incarcerated at FCI Tallahassee. His routines and *modus operandi* involved flagrant violations of FCI Tallahassee's security and operating protocols, which were and should have been obvious to other BOP personnel.

50.     From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten placing himself in posts where he would be alone and unsupervised with prisoners on their job details. For instance, he volunteered to supervise women working at rec when other officers were not around, and he also worked overtime in food services to supervise women working in the kitchen.

51.     From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors,

correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten spending substantial amounts of time alone with incarcerated women. They also observed him escorting certain women to various isolated areas within FCI Tallahassee, which were typically "blind spots" that were not captured by security cameras. There was no legitimate explanation as to why Officer Hatten frequently accompanied incarcerated women to these blind spots by himself.

52.    Officer Hatten, as a correctional officer, knew how to identify various blind spots that fell outside of the view of the security cameras, such as rec shack, upstairs rec, and rooms within the rec shack including the staff bathroom. He repeatedly took advantage of these known blind spots to brutally abuse his victims, including Ms. Sayers, by forcing them to perform oral sex, demanding sexual favors, and/or fondling their body. Other BOP officers knew of, and disregarded, Officer Hatten's abnormal behavior of repeatedly isolating himself with certain prisoners and locking himself inside secluded structures with certain prisoners.

53.    Officer Hatten also abused his authority and flaunted his power by providing his victims with certain benefits or promises of benefits. For example, with the outbreak of COVID-19, jobs at rec became highly sought-after positions by prisoners to allow for some movements outside of the housing units. Officer Hatten indicated, by word and action, that he was protecting Ms. Sayers's job, implying that

it would be taken away if she tried to report him. Officer Hatten also frequently brought contraband and gifts to his victims, including Ms. Sayers, which should have been obvious to other BOP personnel. Had BOP personnel conducted the needed investigations into the benefits that certain prisoners had received from Officer Hatten, they would have discovered and stopped his sexual abuse before he began to sexually assault the Plaintiff in 2021.

54.    At FCI Tallahassee, Officer Hatten quickly developed a widespread reputation among women prisoners for being a "pervert" who said and did inappropriate things to them. This reputation was well known to other BOP personnel, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff.

55.    With the COVID-19 pandemic, Officer Hatten's sexual abuse escalated. For social distancing purposes, correctional officers including Officer Hatten were given more power to isolate prisoners and control the prisoners' movements throughout the facility. Officer Hatten used this power to isolate, terrorize, and abuse his victims at his will. In addition, with COVID-19, other officers, particularly those working in rec, were even less likely to oversee or intervene in Officer Hatten's suspicious conduct than before. Upon information and belief, some of the recreational officers would intentionally avoid being around Officer Hatten while

supervising prisoners to maintain willful blindness towards his sexually abusive conduct, thereby placing vulnerable women at a further risk of sexual abuse.

56.    Upon information and belief, Officer Cornelius Jones ("Officer Jones"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as he should have, Officer Jones allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jones knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Jones turned a blind eye and allowed Officer Hatten unfettered access to his victims. Officer Jones himself was verbally abusive to prisoners, calling them ugly, fat, "bitch," or sexually degrading terms, supporting his dismissive attitude towards Officer Hatten's sexually abusive conduct. In addition, on several occasions, Officer Jones personally saw Officer Hatten locking Ms. Sayers and/or Ms. Hernandez into the rec shack, and proceeded to leave the scene instead of intervening or stopping Officer Hatten's highly abnormal conduct.

57.    Upon information and belief, Officer Eric Love ("Officer Love"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring

Officer Hatten as he should have, Officer Love allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Love knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Upon information and belief, Officer Love had witnessed a prior incident wherein another officer at FCI Tallahassee, Jimmy Highsmith, had sexually abused a woman and was eventually convicted of that crime. Therefore, Officer Love knew or should have known the indications, signs, and concerns of Officer Hatten's sexually abusive conduct. Nonetheless, Officer Love turned a blind eye and allowed Officer Hatten unfettered access to his victims.

58.    Upon information and belief, Officer Larry Mitchell ("Officer Mitchell"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as he should have, Officer Mitchell allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Mitchell knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Mitchell turned a blind eye and allowed Officer Hatten unfettered access to his victims.

59.    Upon information and belief, Officer Nicole Lakoe Jackson ("Officer Jackson"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as she should have, Officer Jackson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jackson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. In fact, around October 2021, Officer Jackson made a comment to Ms. Sayers and Ms. Hernandez that, "y'all need to go sit outside with y'all daddy," referring to Officer Hatten. There was also a separate incident in 2021 when Warden Erica Strong and/or Assistant Warden Kimberly Neely reprimanded rec staff, including Officer Hatten, for allowing Ms. Sayers and Ms. Hernandez to stay in rec when they were not allowed to be there. Upon information and belief, Officer Jackson knew about this reprimand. Yet, Officer Jackson continued to allow Officer Hatten to lock Ms. Sayers and/or Ms. Hernandez into the rec shack. Despite her apparent awareness of inappropriate relationships between Officer Hatten and certain women, Officer Jackson turned a blind eye and allowed Officer Hatten unfettered access to his victims.

60.    Upon information and belief, Officer Lee Adamson ("Officer Adamson"), was the recreation supervisor with authority over Officer Hatten as well as Officers Jones, Love, Mitchell, and Jackson. Instead of monitoring, supervising, and disciplining Officer Hatten as he should have, Officer Adamson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Adamson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them gifts. Nonetheless, Officer Adamson turned a blind eye and allowed Officer Hatten unfettered access to his victims. Upon information and belief, Officer Adamson favored Officer Hatten over other recreational officers and condoned his inappropriate behavior, emboldening Officer Hatten to use the prison facility as his personal brothel. For example, Officer Adamson would give Officer Hatten the first chance at overtime assignments before other recreation officers.

61.    Given the overtness and frequency with which Officer Hatten preyed upon women who were under his custody, other BOP personnel suspected or should have suspected that Officer Hatten was sexually abusing prisoners. Binding PREA regulations mandate staff reporting, whereby all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of

responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. §

115.61(a). When an incarcerated person is subject to a substantial risk of imminent

sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R.

§ 115.62. In addition, administrative investigations of alleged sexual abuse by a staff

member are required to proceed "promptly, thoroughly, and objectively for all

allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The

presumptive disciplinary sanction for substantiated allegations of sexual abuse is

termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental

health care by the BOP. *See id.* § 115.83.

62.    Defendant United States and its agents, servants, contractors, and

employees including but not limited to Officers Jones, Love, Mitchell, Jackson, and

Adamson had numerous opportunities to follow the above-mentioned mandates and

stop Officer Hatten's misconduct. Officer Hatten's actions were abnormal, obvious,

and suspicious for sexual misconduct. In addition, upon information and belief,

correctional officers in the control room were charged with monitoring the security

cameras and following up on any suspicious activities that they noticed on the

cameras. These officers saw or should have seen that Officer Hatten frequently

disappeared into unmonitored areas with prisoners who were not authorized to be in

those areas alone with an officer. Nevertheless, BOP personnel took no actions to

investigate or stop Officer Hatten's suspicious and recurrent behavior.

63.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, and Adamson failed to investigate, discipline, supervise, monitor, question, or stop Officer Hatten despite numerous indications of sexual misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

64.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, and Adamson condoned, permitted, acquiesced to, consented to, and tacitly approved Officer Hatten's longstanding abuse of prisoners. Officer Hatten's ongoing abuse of multiple prisoners at FCI Tallahassee was so widely known throughout the prison that the staff turned it into a running joke. Instead of following protocols to protect the prisoners in their care, the prison staff sat around making jokes at their expense. Their actions – and inactions – allowed Officer Hatten to rape and abuse multiple women with impunity.

65.    Before Officer Hatten orally raped Ms. Sayers in or around October 2021, agents, servants, contractors, and employees of BOP, including at least some of the unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee, were aware of suspicions, indications, or concerns

regarding Officer Hatten's sexual misconduct. They were aware of Officer Hatten's frequent protocol violations and unexplained suspicious interactions with certain prisoners. Nonetheless, they refused to take the required action to report, monitor, supervise, or investigate Officer Hatten.

66.    It is extraordinary and inexplicable that Defendant United States continued to allow Officer Hatten to spend time alone with female prisoners in isolation, creating daily opportunities for him to commit additional sexual assaults.

67.    The fact that Officer Hatten could get away with sexual abuse while flagrantly violating BOP's policies led his victims, including the Plaintiff, to believe that he was untouchable. The victims had legitimate concerns that they would suffer retaliation or other substantial harm if they were to report Officer Hatten's assaults. To further fuel this fear, Officer Hatten verbally threatened his victims, including the Plaintiff, to ensure their silence. He reminded his victims that he had the power to take away their privileges, put them in the SHU, take away their job, or transfer them to a different facility away from their families. Ms. Sayers was particularly vulnerable as her children and family resided in Florida, which Officer Hatten knew.

68.    BOP personnel at FCI Tallahassee, including lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators, knew Officer Hatten's reputation as a sexual predator. They also knew that female prisoners are reluctant to come forward with information regarding staff

sexual abuse for fear of reprisal and loss of work privileges. Despite these known issues, FCI Tallahassee granted Officer Hatten unrestricted and unsupervised contact with numerous women, emboldening him to abuse his position of authority to threaten, violate, and assault his victims.

### HISTORY OF SEXUAL ABUSE AT FCI TALLAHASSEE – "DEN OF DESPAIR"

69.    FCI Tallahassee has a long and sordid history of sexual abuse within its facility by correctional officers against the prisoners whom they were duty-bound to protect.

70.    The facility first gained notoriety in 2006 when there was a shoot-out between a correctional officer and Federal Bureau of Investigation ("FBI") agents that led to the death of two people. In that case, the FBI was present to investigate and arrest six guards for sexually abusing the female prisoners in their custody.[2]

71.    FCI Tallahassee has one of the highest rates of staff-on-prisoner abuse complaints in the country, receiving more than 130 complaints since 2012.[3] It is highly likely that the problem is even more widespread than this figure suggests, but it goes largely unchecked, because of cultural tolerance, cover-ups, and organizational reprisals against prisoners who dare to report staff abuse.

---

[2] *2 federal employees die in Fla. prison shooting*, NBC News, June 21, 2006 at 9:23 AM, https://www.nbcnews.com/id/wbna13415618
[3] Silja J.A. Talvi, *WOMEN REPORT 'RAMPANT' SEXUAL ABUSE AT FEDERAL PRISON WHERE GHISLAINE MAXWELL IS HELD*, The Appeal, Apr 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/

72.    Physician assistant Paul Rolston is alleged to have sexually abused numerous women under his care in FCI Tallahassee beginning in around 2018. Despite several civil complaints filed against PA Rolston, instead of firing this serial abuser, FCI Tallahassee simply transferred him to a male facility, continuing the cycle of silence and abuse at FCI Tallahassee and further perpetuating the environment that protected the abusers at the cost of vulnerable women.[4]

73.    In August 2021, Officer Phillip Golightly was sentenced to 24-months' imprisonment for sexually abusing female prisoners in his care.[5] Even though Officer Golightly was indicted for, and pled guilty to, sexual abuse of only one victim, additional victims who suffered sexual abuse by Officer Golightly were acknowledged as part of the court records.[6] Upon information and belief, Officer Hatten and Officer Golightly, a convicted sexual abuser, were friendly with each other and knew about each other's sexually abusive conduct. In the same way that Officer Hatten summonsed his victims to the isolated rec shack, Officer Golightly called his victims to food services to sexually assault them, even though they did not even work in food services.

---

[4] *Id.*

[5] *Former Bureau of Prisons Correctional Officer Sentenced to 24 Months In Federal Prison For Sexually Abusing Prisoners*, Press Release U.S. Attorney's Office, Northern District of Florida, Aug. 27, 2021, https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

[6] *Id.*

74.    In December 2021, another former recreational specialist at FCI Tallahassee, Officer Jimmy Lee Highsmith, was found guilty by a jury of sexually abusing a prisoner.[7] Upon information and belief, numerous complaints were filed against Officer Highsmith by women at FCI Tallahassee beginning around 2014, and yet BOP personnel at FCI Tallahassee ignored these complaints to keep him employed as a supervisor for women working in rec—same as in Officer Hatten's case.

75.    These are not the only correctional officers who reportedly sexually abused prisoners at FCI Tallahassee during relevant period. For example, at least one civil lawsuit has been filed against Officer Antoine J. Hand.

76.    There are many similarities in *modus operandi* of Officers Golightly, Highsmith, Hand, and Officer Hatten's sexual abuse, including taking women to off-camera areas by themselves and/or using their jobs as a basis for sexual coercion. Therefore, BOP personnel at FCI Tallahassee, including but not limited to recreational officers, supervisors, executive staff, and investigators, knew or should have known that Officer Hatten's conduct was highly indicative of sexual abuse. Nonetheless, BOP personnel violated their mandatory obligations under applicable

---

[7] *Jury Convicts Former Tallahassee Federal Correctional Officer Of Sexual Abuse of Prisoner*, Press Release U.S. Attorney's Office, Northern District of Florida, Dec. 17, 2021, https://www.justice.gov/usao-ndfl/pr/jury-convicts-former-tallahassee-federal-correctional-officer-sexual-abuse-inmate.

BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

77.    BOP personnel's reckless disregard of the safety and welfare of victims including Plaintiff Ms. Sayers is highlighted by the fact that multiple correctional officers were sexually assaulting women incarcerated at FCI Tallahassee throughout the relevant times. Officer Hatten fed into, and was also encouraged and enabled by, this toxic culture at FCI Tallahassee.

78.    Despite BOP's purported zero-tolerance policy, sexual abuse of incarcerated people is an issue endemic to BOP, beyond FCI Tallahassee as well. In 2022, the U.S. Senate Permanent Subcommittee on Investigations issued a report (hereinafter "the PSI Report"), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds of federal prisons that have held women (19 out of 29 facilities). The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated people by BOP personnel. The PSI Report specifically found that the United States,

through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[8]

79.    Despite this established history of sexual abuse in BOP custody and at FCI Tallahassee specifically, Defendant United States failed to institute a reliable practice for detecting and stopping sexual abuse of incarcerated people. As a telling example, FCI Tallahassee's PREA audit reports that were published on or around July 6, 2021, and July 4, 2023, claimed that FCI Tallahassee was compliant with all PREA standards. Even though this audit report was published after PA Rolston and Officers Golightly, Highsmith, and Hatten's sexual abuse became public through criminal investigation, this obvious non-compliance with PREA standards cannot be found anywhere in the reports. This blatant deficiency reflects the culture of Defendant United States of turning a blind eye to BOP sexual abuse of incarcerated people.

80.    Based on the history of sexual abuse at FCI Tallahassee, Defendant United States had actual notice and knowledge that correctional officers could abuse their position of power to sexually assault prisoners, including in off-camera areas.

---

[8] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 4.

81.     Nevertheless, Defendant United States failed to take adequate steps to prevent Officer Hatten from engaging in recurrent sexual abuse, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

82.     Upon information and belief, from around August 2019 through July 2022, Officer Hatten sexually abused numerous women in his custody at FCI Tallahassee. Other than Ms. Sayers, ten (10) additional women have reported Officer Hatten's abuse to the BOP and/or FBI and other external investigative agencies.

83.     Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FCI Tallahassee before, during, and after Officer Hatten's abuse of the Plaintiff.

### OFFICER HATTEN's SEXUAL ABUSE OF PLAINTIFF

84.     Emboldened by other BOP personnel's failure to stop him, with increasing fearlessness, Officer Hatten used the tools available to him through the BOP, such as access to prisoners, control over their jobs and livelihood, and blind spots from cameras, to violate and terrorize his victims, including Plaintiff Ms. Sayers.

85.    Ms. Sayers first arrived at FCI Tallahassee in or around 2015 or 2016 at around 25 years of age and remained incarcerated there until around November 2024 when she was released from BOP custody as she was granted a reduction in sentence in relation to Officer Hatten's sexual abuse.

86.    Throughout this time, Ms. Sayers was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as Ms. Sayers from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

87.    At FCI Tallahassee, Ms. Sayers's jobs were mostly with rec and/or laundry. Early on, she noticed that Officer Hatten was always around the prisoners, either working at rec or doing overtime in food services that was located near the laundry. With certain officers' shift changes, in or around 2020, Ms. Sayers began to work full time as a clerk in the rec shack with Officer Hatten as her direct supervisor. It did not take long for Officer Hatten to start making inappropriate sexual remarks

to her, for example referring to his penis as his "third leg." Initially, Ms. Sayers thought that Officer Hatten was just an overly friendly person.

88.    Gradually, Officer Hatten escalated his abuse by forcibly grinding or rubbing his body against Ms. Sayers, grazing his erect penis against her body in doorways, and fondling her body or hugging her. Over time, the physical touches became increasingly more frequent and brazen, on her waist, buttocks, legs, hands, shoulder, head, and hair. Ms. Sayers felt uncomfortable but did not feel that she could speak up against an officer, especially as he was her supervisor for the rec clerk position that she enjoyed. Not only would Officer Hatten touch Ms. Sayers on the job at rec, but he would also personally come to her prison cell under the pretext of escorting her to work. There was even an occasion when Officer Hatten entered Ms. Sayers's cell at around 5:00 AM to awaken her by fondling, what he assumed was, her foot, but it was actually her cellmate's foot who was startled awake. Despite Officer Hatten's apparent and abnormal conduct, BOP staff did nothing to report or stop his interactions with Ms. Sayers.

89.    Officer Hatten took every opportunity to call Ms. Sayers out to recreation in the early morning to see him, including when she did not have work to do, or when she was assigned to the afternoon shift. This was well outside the normal routine and should have been noticed by other officers, including Officers Adamson, Jones, Love, Mitchell, and Jackson, as well as Ms. Sayers's unit team.

90.     Using the COVID-19 pandemic to his advantage, Officer Hatten found ways to make sure that he was the only correctional officer escorting certain women to rec and staying with them in certain locations at rec. For example, he would take women to the rec shack while other officers were in upstairs rec, and vice versa. This was in violation of the operating protocols under which at least two officers should have supervised women working recreation details. However, none of Officer Hatten's colleagues, including Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson, intervened to stop Officer Hatten's inappropriate conduct.

91.     Upon information and belief, around mid-2020, Officer Hatten began to lock certain women including Ms. Sayers into the rec shack with an intent to abuse them there without interruption. This *modus operandi* continued undeterred up to his resignation in August 2022. There were times when Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson would notice the rec shack door being locked. Even though they knew or should have known that Officer Hatten was there with a prisoner, they took no step to intervene or protect the prisoner.

92.     Of note, even when Officer Hatten was assigned to upstairs rec, he would lock himself inside the rec shack with certain women, and the other rec officers including Officer Love and Officer Jackson would go to upstairs rec and

informally swap posts with Officer Hatten. By such action, the other rec officers permitted, condoned, and/or acquiesced to his misconduct.

93.    Officers Adamson, Jones, Love, Mitchell, and Jackson violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

94.    Officer Hatten took every opportunity to spend time alone with Ms. Sayers behind locked doors, for example in the rec shack or in his office that was a separate room within the rec shack. There were no security cameras that captured the inside of the rec shack or Officer Hatten's office. Nonetheless, BOP staff exercised no effort to investigate or stop Officer Hatten's suspicious conduct.

95.    Ms. Sayers noticed that Officer Hatten also frequently locked Ms. Hernandez into the rec shack. Sometimes, Officer Hatten would lock one of them in his office and the other outside his office but inside the rec shack. Officer Hatten's sexual comments as well as fondling and groping continued, and he warned them not to say anything or there would be consequences.

96.    Sometime in 2021, recreational officers including Officer Hatten were reprimanded by Warden Strong and/or Assistant Warden Neely for keeping Ms. Sayers and Ms. Hernandez in rec when they should not be. Nonetheless, Officer Hatten continued to spend time with Ms. Sayers and/or Ms. Hernandez in the rec shack, which should have been suspicious to the BOP staff. No one intervened. Officer Jones, for example, would simply leave if he saw Ms. Sayers and Ms. Hernandez in the rec shack.

97.    Officer Hatten's actions towards Ms. Sayers escalated to forcible sexual assault in or around October 2021. That morning, Officer Hatten again came to Ms. Sayers's cell at or before 6:00 AM, under the pretext of bringing her to work at the rec shack. It should have been apparent to BOP staff including Sayers's unit team, as well as any rec staff that was present, that Ms. Sayers being called to the rec shack to spend time alone with Officer Hatten at 6:00 AM was highly abnormal.

98.    While working in the rec shack, Ms. Sayers realized that she needed some supplies like popcorn bags or trash bags to finish her assignments. Officer Hatten suggested that she could check the staff bathroom, which is a very small, separate room within the rec shack. Ms. Sayers went into the staff bathroom and stood up on the toilet to look in a storage cubby above the toilet where miscellaneous items were stored. Then, she heard the door close behind her.

99.    When she turned around, Officer Hatten was standing there with his penis out. During this entire encounter, Officer Hatten stood in front of the door, blocking it with his body. Ms. Sayers was panicked, not knowing what to do.

100.    Officer Hatten kept touching his penis and said something like, "I know you ain't seen one of these in a long time. You don't want to suck it?" Ms. Sayers started to cry. Officer Hatten threatened her, that no matter what happened, "they're either going to believe you or me, and you know who it will be." He cautioned her not to make it "worse." Ms. Sayers got off the toilet and attempted to physically fight off Officer Hatten by kicking him in his knee. However, Officer Hatten overpowered her and grabbed her by her arms. He said that she did not need to do "too much," he "just" wanted her to give him oral sex. Ms. Sayers felt that this was the only way out and complied with his demand.

101.    Ms. Sayers cried hysterically throughout and after the assault. Officer Hatten kept her locked in the rec shack for about an hour until the rest of her unit came for their rec time. During this hour, and afterward while following her back to her housing unit, Officer Hatten repeatedly threatened Ms. Sayers not to say anything. He said that he would put her in the SHU and ship her away from her family, and that no one would believe her anyway. He would then switch his demeanor to being conciliatory, telling her that he would "make it up" to her. After

this assault, Officer Hatten brought Ms. Sayers gifts that she would otherwise not have access to within the prison, including body wash, nail polish, and food.

102.   Shortly after the forced oral sex in or around October 2021, while Officer Hatten was on a short medical leave, Officer Jones saw Ms. Sayers in the rec shack and became unreasonably enraged, calling her a "bitch," "ugly ass," and "stupid ass" and telling her to leave the rec shack. Given what Officer Hatten had done to her, Ms. Sayers did not mind losing her job at rec at this point, even though she enjoyed it greatly. She found the courage to report Officer Jones's comments to Officer Adamson as well as Assistant Warden Neely. After this, Officer Jones fired Ms. Sayers as well as her entire crew from the rec detail as retaliation. Ms. Sayers gladly went to work in laundry instead.

103.   When Officer Hatten returned from his leave, he told Officer Adamson that he wanted Ms. Sayers back on his crew. He claimed that Ms. Sayers and Ms. Hernandez were the only two individuals in the entirety of FCI Tallahassee who knew how to operate the machinery and do the paperwork for the rec department. Officer Hatten's poor excuse should have been a cause of concern for Officer Adamson, as such blatant favoritism is expressly prohibited by the BOP protocols and should have been immediately reported and investigated. Instead, Officer Adamson condoned Officer Hatten's inappropriate conduct and allowed him continued unfettered access to Ms. Sayers.

104.   Ms. Sayers never submitted formal paperwork to return to her rec position as she wanted to avoid Officer Hatten. Nonetheless, Officer Hatten continued to assign her to the rec detail in either official or unofficial capacity until he left FCI Tallahassee in or around August 2022. Throughout this time, it remained part of the routine for Officer Hatten to make sexual comments and fondle Ms. Sayers's body over her clothes or rub himself against her when he had the opportunity.

105.   Ms. Sayers believes that the reason she was not raped again was because Officer Hatten was repeatedly assaulting Ms. Hernandez. There were times when Ms. Sayers would go to the rec shack in the morning and she would notice that it was locked, with Ms. Hernandez and Officer Hatten inside. Ms. Sayers inferred, based on her own experience, that Officer Hatten was likely sexually assaulting Ms. Hernandez, even though she was too afraid to confirm this directly. Ms. Hernandez sometimes also begged Ms. Sayers to go to rec together, to not let her be alone with Officer Hatten, which confirmed Ms. Sayers's suspicion. Ms. Sayers felt helpless as she did not believe that Ms. Hernandez had the power or capacity to report Officer Hatten either.

106.   Officer Hatten continued to lock Ms. Sayers into the rec shack, the staff bathroom, or his office. Other BOP personnel, with due diligence, should have noticed that Ms. Sayers was routinely locked into the rec shack and forced back onto

a work detail that she had been removed from. The unusualness of the situation should have been alarming to other officers and should have been immediately reported and investigated so that it would not progress further. Instead, despite being aware of Officer Hatten's suspicious behavior, his colleagues and supervisors refused to take any action, allowing him to act with impunity.

107.    Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Sayers in an off-camera area without interruption. There were no security cameras that captured the inside of the rec shack where the assault occurred.

108.    Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending so much time alone and off-camera with Ms. Sayers. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Sayers. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

109.   After the forced oral sex in or around October 2021, Officer Hatten gave Ms. Sayers the ability to place online orders for things that she wanted, such as brand body wash, shampoo, or nail polish. He also continued to visit Ms. Sayers at her cell and brought her outside food. Upon information and belief, providing contraband to prisoners is a common, predatory tactic used in the context of sexual abuse and should have resulted in termination of Officer Hatten. Yet no BOP officer spoke to Ms. Sayers about how she acquired these contraband items.

110.   Other BOP personnel, with due diligence, should have noticed that Ms. Sayers had routine access to things that she could only have received from an officer with outside contact. This type of favoritism is expressly prohibited by the BOP protocols and should have been immediately reported and investigated. Without intervention from his colleagues and supervisors, Officer Hatten used his power and authority as a correctional officer to provide Ms. Sayers with contraband, initially as a coercive tactic but later also for extortion. He would threaten or imply that Ms. Sayers could get in trouble if she were to report him.

111.   A couple of weeks before he permanently left FCI Tallahassee in August 2022, Officer Hatten made another attempt to sexually assault Ms. Sayers. Officer Hatten knew that Ms. Sayers's birthday was July 29. One day around July 29, 2022, Officer Hatten ordered Ms. Sayers to come to the rec shack early for work. She realized that he had brought outside food and some gifts for a private birthday

party with Ms. Sayers, Ms. Hernandez, and himself in the rec shack. He shared personal information about himself, namely that his own birthday is coming up in August, and that he expected some "special treatment." Ms. Sayers felt fear that something sexual was going to happen, but did not see a way out of it.

112.   When Ms. Hernandez had to use the restroom, Officer Hatten saw a chance to isolate Ms. Sayers. He intentionally did not let Ms. Hernandez use the staff bathroom that he had let her use on multiple occasions, and ordered her to use the bathroom that was outside instead. When Ms. Hernandez left, Officer Hatten locked the door and called Ms. Sayers over. He made sexual propositions, saying something like "You don't want to know what it feels like again?" and "You sure you don't want it for your birthday?" Ms. Sayers declined and tried to tell him that she does not like men. Officer Hatten dismissed her, saying something to the effect of "What can a woman do that I can't?" Ms. Sayers declined again. Officer Hatten offered to give her oral sex. Ms. Sayers declined again. He then pulled his face very close to hers and said something like, "Are you sure you don't want me to try?" Ms. Sayers declined again.

113.   As Ms. Sayers did her best not to engage with Officer Hatten, Ms. Hernandez fortunately returned from the bathroom and began knocking on the rec shack door. Officer Hatten stopped accosting Ms. Sayers and opened the door for Ms. Hernandez.

114.   Shortly after this incident, Officer Hatten left on vacation, and Ms. Hernandez took that opportunity to report his rape to prison officials.

115.   Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, and/or Adamson, were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to the Plaintiff Ms. Sayers's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep the Plaintiff safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

116.   Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hatten; and his propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as the Plaintiff, demonstrating a plain disregard of an excessive risk to her safety and welfare.

117.   The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

## AFTERMATH OF OFFICER HATTEN'S SEXUAL ABUSE

118.   After Ms. Hernandez reported him in or around August 2022, Officer Hatten did not return from his vacation and eventually "resigned" from his employment. Seeing this, Ms. Sayers felt that she should also report her abuse.

119.   Ms. Sayers did not know how convoluted and exasperating the subsequent process would be. Ms. Sayers was subsequently compelled to participate in several internal and government interviews regarding her abuse. She initially spoke with Special Investigative Agent Regina Eastburn ("SIA Eastburn"), who noted that Ms. Sayers and Ms. Hernandez's accounts were reliable and consistent—which was particularly significant because Ms. Hernandez had been put in the SHU after reporting Officer Hatten and therefore was unable to communicate with Ms. Sayers. SIA Eastburn then contacted the FBI, who later also took Ms. Sayers's statement. These interviews were held without an advocate or attorney present, which made Ms. Sayers extremely uncomfortable. Ms. Sayers did not know if *she* could be in trouble for violating BOP's internal policies regarding sexual contact as well as contraband. She also did not know which other officers would find out about

her report and possibly retaliate against her for turning in their colleague. While she did her best to cooperate with the investigation, she was also not given any update or information regarding the status of the investigation. With repeated interviews, Ms. Sayers felt traumatized by having to go through and recall the situation repeatedly. She tried to ask SIA Eastburn if she could have her attorney or a psychologist present for the interviews for emotional support, but she was told no.

120.    Ms. Sayers's fear of retaliation was proven true. Ms. Hernandez was put in the SHU immediately following her report. Ms. Sayers also began to experience what she perceived as retaliation and harassment from other FCI Tallahassee staff after reporting Officer Hatten's assault.

121.    Around December 2022, after speaking with SIA Eastburn, Ms. Sayers was told by Captain FNU Ritchie that she had to find another job than in rec, even though Officer Hatten was already gone. She was formally put back on laundry duties full time in or around January 2023. Around February 2023, one of her supervisors in laundry, Officer FNU Hamilton, made a public comment that women needed to leave the laundry room during lunch break because he "didn't want anybody trying to put a PREA charge on me." PREA refers to the Prison Rape Elimination Act, and Ms. Sayers interpreted this comment as targeting her, especially as Officer Hamilton's wife was also working at FCI Tallahassee and was one of the people who took Ms. Sayers's report regarding Officer Hatten. Around the same

time, she also remembers a comment by Officer FNU Gordon during a town hall meeting, where he said something like, "I don't got time for this. I don't want to be on anybody's indictment." Again, Ms. Sayers took this as intimidation or harassment targeted at her, given how recent her report on Officer Hatten was. Around May 2023, when Officer Hatten was indicted, Ms. Sayers also lost her laundry job and was sent to the SHU on what Ms. Sayers believes was a false charge. Ms. Sayers was devastated to learn, upon her release from the SHU in or around August 2023, that Officer Hatten had only been sentenced to three months for his heinous sexual abuse of Ms. Hernandez. Ms. Sayers was never informed regarding the progress of any investigation into her own claims of abuse against Officer Hatten.

122.    Throughout Ms. Sayers's incarceration at FCI Tallahassee, which lasted up until November 2024, BOP also failed to provide proper counseling or psychological treatment to Ms. Sayers, despite PREA and BOP mandates to provide her with such services. *See* 28 C.F.R. § 115.83. Following Officer Hatten's abuse, Ms. Sayers lost a significant amount of weight, suffered hair loss, and experienced high blood pressure that her psychologist believed was caused in part by the extreme stress and anxiety related to the abuse.

123.    Even though she was released from BOP custody in or around November 2024, to this day, Ms. Sayers is continuing to suffer the costs of her victimization at Officer Hatten's hands. She is depressed and anxious, with feelings

of distrust, hypervigilance, helplessness, and lack of social connection with others. She suffers from night terrors, suicidal thoughts, and loss of a sense of pleasure in things that were previously enjoyed. She has been diagnosed with complex PTSD, anxiety disorder, sexual distress and dysfunction, suicidal ideation, and major depressive disorder as well as bipolar disorder, requiring several psychiatric medications. While she found therapy helpful, she stopped going as she could not afford the cost, which was close to $1,000.00 per session.

124.   As a result of the foregoing, Ms. Sayers continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Sayers also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

125.   Upon information and belief, Ms. Sayers will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to

incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's assaults.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### NEGLIGENCE CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

126.    Plaintiff hereby repeats, reiterates, and incorporates by reference paragraphs 1 through 125 with the same force and effect as if fully set forth herein.

*United States' liability for the acts and omissions of its employees*

127.    At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Tallahassee, including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, Officer Adamson, as well as Officer Hatten's other colleagues and/or supervisors whose identity is currently unknown to the Plaintiff. Within the scope of their employment, these individuals were tasked to and did provide custodial care, control, and supervision to people incarcerated at FCI Tallahassee, including but not limited to the Plaintiff Ms. Sayers.

128.    At all relevant times, FCI Tallahassee personnel including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and Officer Adamson held themselves out to persons incarcerated at FCI Tallahassee, and in particular to Plaintiff, as correctional and/or administrative personnel with the knowledge,

capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

129.   At all relevant times, FCI Tallahassee personnel including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, within the scope of their employment with the United States, owed a non-delegable duty of care to Plaintiff while she was housed at FCI Tallahassee.

130.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to ensure that correctional and/or administrative personnel with a history of sexual assaults were not allowed to harm or injure other incarcerated people.

131.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to use reasonable care for the safety of incarcerated individuals within their custodies.

132.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to maintain, operate, and control FCI Tallahassee as a safe and secure space for persons in it, including but not limited to Plaintiff.

133.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to provide adequate custody, control, supervision, and monitoring to persons at FCI Tallahassee, including but not limited to Plaintiff.

134.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to adequately protect incarcerated people including Plaintiff from the foreseeable harm inflicted by BOP personnel known to be dangerous, including Officer Hatten.

135.   As described in paragraphs 45, 53, 61-64, 89-96, 103, 115, and 122, it was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to ensure that any suspicion or indication of sexual abuse was reported through the chain of command for full investigation. Such suspicion or indication of sexual abuse would include Officer Hatten's suspicious conduct as described in paragraphs 3, 6, 10, 21, 55, 65, 94, 96, and 106; his violation of the operating protocols and/or rules as described in paragraphs 18, 49, 90, 93, 110, and 116; and his provision of contraband and/or other benefits to his victims including Ms. Sayers as described in paragraphs 20, 53, 101, and 109-111.

136.   It was the duty of Officer Adamson and other supervisory officers whose identity is currently unknown to the Plaintiff, as federal employees, while acting within the scope of their office or employment, to ensure that all BOP employees are trained, supervised, and monitored properly.

137.   As described in paragraphs 5, 19, 51-52, 76, 80-81, and 107-108, it was the duty of certain supervisory and/or administrative staff whose identity is currently unknown to the Plaintiff, as federal employees, while acting within the scope of their office or employment, to ensure that security cameras are installed, monitored, and attended to throughout FCI Tallahassee, such that sexual assaults described herein would not occur under their watch.

138.   Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, as federal employees and while acting within the scope of their office or employment, breached each of the foregoing duties in paragraphs 127 through 137 that they owed to Plaintiff by failing to take adequate steps to protect her from Officer Hatten promptly, despite the numerous warning signs and indications of sexual abuse presented by Officer Hatten. To the extent that any other correctional, supervisory, and/or administrative staff of FCI Tallahassee, such as Ms. Sayers's unit team (see paragraphs 5-6, 20, 88-89, and 97), warden or assistant warden (see paragraphs 59, 96, and 102), or special investigative agents (see paragraphs 48 and 93), were aware of Officer Hatten's sexually abusive conduct and

turned a blind eye to it, they also breached the duties owed to the Plaintiff by failing to take adequate steps to protect her from Officer Hatten promptly.

139.    The breach by federal employees described in paragraph 138 directly exposed Plaintiff to an unreasonable risk of bodily injury, causing her to fear for her life and safety, and resulted in her being assaulted by Officer Hatten as described above.

140.    Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

141.    Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

142.    Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten.

As described in paragraphs 56, 61-64, 89-91, and 96, Officer Jones observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

143.   Officer Jones, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

144.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

145.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

146.   Officer Jones, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's

recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

147.   Officer Jones, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

148.   In each of the foregoing ways as alleged in paragraphs 140 through 147, Officer Jones did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

149.   In each of the foregoing ways as alleged in paragraphs 140 through 147, Officer Jones, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

150.   In each of the foregoing ways as alleged in paragraphs 140 through 147, Officer Jones, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

151.   Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

152.   Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

153.   Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 57, 61-64, and 89-92, Officer Love observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

154.   Officer Love, as a federal employee and while acting within the scope of his employment, knew that there were prior incidents at FCI Tallahassee where officers sexually abused prisoners with similar *modus operandi* as Officer Hatten's, and yet ignored the blatant suspicions and/or indications of Hatten's sexual abuse.

155.   Officer Love, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

156.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

157.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

158.   Officer Love, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

159.   Officer Love, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate,

or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

160.   In each of the foregoing ways as alleged in paragraphs 151 through 159, Officer Love did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

161.   In each of the foregoing ways as alleged in paragraphs 151 through 159, Officer Love, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

162.   In each of the foregoing ways as alleged in paragraphs 151 through 159, Officer Love, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

163.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

164.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with

him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

165.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 58, 61-64, and 89-91, Officer Mitchell observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

166.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

167.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

168.    Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

169.    Officer Mitchell, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

170.    Officer Mitchell, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

171.    In each of the foregoing ways as alleged in paragraphs 163 through 170, Officer Mitchell did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

172.    In each of the foregoing ways as alleged in paragraphs 163 through 170, Officer Mitchell, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

173.   In each of the foregoing ways as alleged in paragraphs 163 through 170, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

174.   Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

175.   Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

176.   Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 59, 61-64, and 89-92, Officer Jackson observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner,

such that she knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet she did not do so.

177.   Officer Jackson, as a federal employee and while acting within the scope of her employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

178.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

179.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

180.   Officer Jackson, as a federal employee and while acting within the scope of her employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer

Hatten's recurrent sexual abuse. She enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

181.   Officer Jackson, as a federal employee and while acting within the scope of her employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

182.   In each of the foregoing ways as alleged in paragraphs 174 through 181, Officer Jackson did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

183.   In each of the foregoing ways as alleged in paragraphs 174 through 181, Officer Jackson, as a federal employee and while acting within the scope of her employment, neglected to apply the skill she did have.

184.   In each of the foregoing ways as alleged in paragraphs 174 through 181, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not use reasonable care in applying the skill she had.

185.   Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

186.   Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

187.   Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 60-64, 89-91, and 102-103, Officer Adamson observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

188.   Officer Adamson, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

189. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

190. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as Officer Hatten's direct supervisor, allowed him unfettered access to his victims under the pretext of supervising female prisoners working in recreation.

191. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

192. Officer Adamson, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

193.   Officer Adamson, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

194.   In each of the foregoing ways as alleged in paragraphs 185 through 193, Officer Adamson did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

195.   In each of the foregoing ways as alleged in paragraphs 185 through 193, Officer Adamson, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

196.   In each of the foregoing ways as alleged in paragraphs 185 through 193, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

197.   United States is the sole proper defendant for each breach of duty by federal employees, Officers Jones, Love, Mitchell, Jackson, and/or Adamson alleged in foregoing paragraphs 129 through 218 under the FTCA. United States is vicariously liable for the acts or omissions of its agents, servants, contractors, and/or employees that occur within the scope of their employment as here.

198.   Plaintiff's injuries herein were proximately caused by the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of United

States' employees including Officers Jones, Love, Mitchell, Jackson, and/or Adamson, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

199.  Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's employment at FCI Tallahassee was essential to their commission of tortious misconduct, which could not have occurred absent their federal employment and related privileges.

200.  Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's conduct was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of Plaintiff.

201.  Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson were aware of facts that gave rise to an unreasonable risk that Plaintiff would be irreparably injured.

202.  It was foreseeable to Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, based on the facts known to them, that Plaintiff was at risk of imminent serious harm including sexual abuse.

203.  Yet, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson in their official capacities failed and/or refused to prevent the abuse of Plaintiff or to prevent its psychological consequences from worsening to the extent that they did.

204.   Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, acting as agents, servants, contractors, and/or employees of the United States, knew that they had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

205.   The failure of FCI Tallahassee personnel, namely Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson to prevent, investigate, or acknowledge Officer Hatten's sexual abuse of prisoners, including Plaintiff, served no legitimate policy purpose. On the contrary, FCI Tallahassee staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. The failure to do so by Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, Officer Adamson, and/or other personnel currently unknown to Plaintiff, was patently outside of their discretionary function.

*United States' liability for its own acts and omissions*

206.   Defendant United States also had independent duty owed to the Plaintiff to adequately protect people incarcerated in its custody and to exercise due diligence in hiring, training, retaining, and supervising its employees.

207.   Defendant United States failed abjectly in its duty to detect, prevent, and investigate sexual abuse in its facility (see paragraphs 78-81), to safeguard its

prisoners from its own employees (see paragraphs 66 and 80-83), to provide psychological care and treatment to these victims (see paragraphs 119 and 122), to protect them from retaliation (see paragraphs 79 and 120), and to provide a reliable, confidential reporting mechanism (see paragraphs 119 and 121).

208.    Defendant United States failed to provide reasonably safe environment to Plaintiff, who was under its care, custody, and control without ability to escape.

209.    Plaintiff' injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61, Program Statement 5324.12; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a), Program Statement 3420.11; and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

210.    Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in improperly hiring, training, retaining, supervising, and/or disciplining Officer Hatten as described in paragraphs 17, 48, 63, 66, and 68.

211.    Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in failing to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate with impunity.

212.    Defendant United States acted negligently in hiring Officer Hatten, as well as Officers Jones, Love, Mitchell, Jackson, and/or Adamson, who did not possess the necessary skill to maintain safe and secure environment and protect Plaintiff from foreseeable harm.

213.    Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

214.    United States' acts and omissions as described in paragraphs 206 through 212 proximately caused Plaintiff's injuries.

*Summary*

215.   The above-described acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, and the United States constitute the tort of negligence under the laws of the State of Florida.

216.   Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Sayers in accordance with the laws of Florida, for the negligence upon Ms. Sayers.

217.   Plaintiff's injuries were inflicted through no fault or want of care or contributory negligence on the part of Plaintiff.

218.   Officer Hatten's continued rape and abuse of Ms. Sayers meet Florida state's requirements for physical impact.

219.   As a direct and proximate result of the foregoing, Plaintiff Ms. Sayers suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

220.   As a direct and proximate result of the foregoing, Ms. Sayers has suffered serious harm including, without limitation, physical, psychological,

emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

221.   Plaintiff hereby repeats, reiterates, and incorporates by reference paragraphs 1 through 220 with the same force and effect as if fully set forth herein.

222.   As described in paragraphs 126 through 220, Defendant United States, individually or through Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, in their official roles and capacities as agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to Plaintiff.

223.   The acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, described in paragraphs 126 through 220, constituted extreme and outrageous conduct.

224.   Plaintiff in fact suffered debilitating emotional suffering.

225.   The above-described acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson constitute the tort of negligent infliction of emotional distress under the laws of the State of Florida.

226.   Florida state law only recognizes this tort if it meets the requirements under the impact rule, which requires either physical touch or a physical manifestation of emotional distress. The "touch" requirement can be met with a foreign object, such as a gun or by a perpetrator's hands. Therefore, even without a physical manifestation of emotional harm, the Court can make a finding of negligent infliction of emotional distress. *See Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846 (Fla. 2007).

227.   Here, Officer Hatten repeatedly sexually abused Plaintiff, meeting the requirement of both physical touch and physical manifestation of emotional distress. Officer Hatten's sexual abuse of Plaintiff was severe and repetitive, and caused Plaintiff physical pain and extreme emotional trauma.

228.   Under the FTCA, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

229.   Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Sayers in accordance with the laws of Florida, for the negligent infliction of emotional distress upon Ms. Sayers.

230.   As a direct and proximate result of the foregoing, Plaintiff Ms. Sayers suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent

physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

231.   As a direct and proximate result of the foregoing, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Ms. Sayers is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Raven Sayers respectfully requests that judgment be entered against Defendant United States, and that this Court grant the following to the Plaintiff:

1.   An award of compensatory damages for all injuries caused by the Defendant, including psychological and personal injuries, pain and suffering, emotional distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, and mental, financial, economic, and reputational damages, both past and future, general and special, and other harm, in an amount to be determined at trial;

2.    An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

3.    An award of reasonable costs of suit and litigation expenses to the fullest extent permitted by law;

4.    An award of reasonable attorneys' fees to the fullest extent permitted by law; together with

5.    Such other and further relief at law or in equity as this Court may deem just and proper.


S/ *Jaehyun Oh*                          S/ *Whitney Marie Untiedt*
**JAEHYUN OH***                          **WHITNEY MARIE UNTIEDT**
The Jacob D. Fuchsberg Law Firm,         Untiedt Dabdoub, PLLC
LLP                                      1600 Ponce De Leon Blvd., 10th Floor,
3 Park Avenue, 37th Floor,               Coral Gables, FL 33134
New York, NY 10016                       Florida Bar No. 15819
New York Bar No. 5668512                 Tel: (305) 330-2397
Tel: (212) 869-3500 Ext. 245             whitney@udlawyers.com
j.oh@fuchsberg.com                       *Attorney for Plaintiff*
*Attorney for Plaintiff*
(* *Pro Hac Vice* Application
Forthcoming)